UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| JOHNSON SERVICE GROUP, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:22-CV-146 |
| vs. | ) |
| | ) |
| JACKIE DEAN STANHOPE, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Plaintiff filed a Motion for Default Judgment and supporting affidavit [Docs. 11, 11-1] requesting entry of default judgment against Defendant pursuant to Federal Rule of Civil Procedure 55(b)(1). This motion was referred to the undersigned for a report and recommendation by the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 12]. For the reasons set forth below, the Court recommends that Plaintiff's Motion [Doc. 11] be **GRANTED**. The Court further recommends that Plaintiff be awarded damages in the amount of $59,000.00.

I.   **Factual Background and Procedural History**

On November 15, 2022, Plaintiff filed a Complaint [Doc. 1] alleging that Defendant improperly received temporary living allowance ("TLA") payments while employed by Plaintiff pursuant to a written employment agreement. Plaintiff is a staffing and consulting company that provides contractual staffing to the Tennessee Valley Authority ("TVA") for various TVA projects. Defendant contracted with Plaintiff to work as a field supervisor on the TVA's Boone Hydro Project near Kingsport, Tennessee. Contract employees on TVA projects are eligible to receive TLA payments subject to certain conditions. Those conditions require that 1) the employee

maintain a dwelling that is his permanent residence; 2) that the dwelling be located more than 60 miles away from the TVA jobsite to which the employee is assigned; and 3) that the employee incurs substantially all of the costs for the upkeep and maintenance of the residence. Additionally, a dependent family member must continue to occupy the permanent residence during all periods for which TLA payments are reimbursed to the employee. Finally, any rental or lease agreement for the permanent residence must result from an arm's length transaction (i.e., it cannot involve related parties).

Plaintiff alleges that between 2012 and 2016 Defendant filed annual TLA applications stating that his permanent residence was 240 SW Cindy Lane, Burleson, Texas and certifying that his wife, Effie Stanhope, would continue to reside at the permanent residence. Defendant supported these applications with lease agreements identifying Jack and Effie Stanhope as the lessees of the Burleson, Texas home and Barbara Coleman as the owner/lessor. Plaintiff asserts that Barbara Coleman is the sister of Effie Stanhope, and that Ms. Coleman, Ms. Stanhope, and Jerry Livingston had each inherited a 1/3 share of the Burleson, Texas residence after the 2010 death of their mother, Lizzie Patterson. Further, Plaintiff states that during the relevant timeframe, Jerry Livingston was the one who resided at the Burleson, Texas home and paid substantially all of the cost for the residence's upkeep and maintenance. According to Plaintiff, rather than Effie Stanhope living in this Texas home, she had resided with her husband at his temporary residences in Ooltewah and Blountville, Tennessee and Ringgold, Georgia. Plaintiff alleges that given these circumstances, Defendant was not entitled to the TLA payments he received because Defendant 1) did not have a qualifying dependent occupying the residence; 2) did not incur substantially all of the expenses at his claimed permanent residence because Jerry Livingston lived in it and paid rent, utilities, and a portion of the maintenance and upkeep during the relevant time; and 3)

provided Plaintiff with a false lease agreement or, at a minimum, one that was not the result of an arm's length transaction. In short, Plaintiff alleges that Defendant withheld relevant information from each of his TLA applications and provided false and misleading documents to Plaintiff, which resulted in him receiving over $80,000.00 in improper TLA payments.

After the Complaint was filed, a summons was issued and later returned executed. [Docs.7, 8, 8-1]. The proof of return indicates that Ashley Faulkenberry personally served the summons on Defendant at 2664 Copper Cove, Ooltewah, Tennessee on January 24, 2023. [Doc. 8]. Thereafter, Defendant failed to file an answer or otherwise responded to Plaintiffs' Complaint. As a result, Plaintiffs filed an application for entry of default and submitted a supporting affidavit, after which a Clerk's Entry of Default was docketed. [Docs. 9, 10]. Notice of the Clerk's Entry was mailed to Defendant at 2664 Copper Cove, Ooltewah, Tennessee on March 17, 2023.

Plaintiff has now filed a Motion for Default Judgment [Doc. 11]. In an accompanying affidavit, Plaintiffs' counsel requests that the Court render default judgment against Defendant in the amount of $80, 857.70, plus interest and costs. [Doc. 11-1]. This matter has now been referred to the undersigned for review. [Doc. 12].

## II. Legal Analysis

Rule 55(a) requires the Clerk of Court to enter default "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise…." Fed. R. Civ. P. 55(a). Following the Clerk's entry of default, a party may move the Court for entry of default judgment. Fed. R. Civ. P. 55(b). Here, Plaintiff filed an application for entry of default as required by Rule 55(a). [Doc. 9]. In response, the Clerk

filed an Entry of Default. [Doc. 10]. Plaintiff now comes before the Court requesting default judgment pursuant to Rule 55(b).

### a. *Service of Process*

For the Court to analyze and adjudicate this matter, Plaintiffs must have properly served process on Defendants against whom judgment is sought. *O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345, 353 (6th Cir. 2003); *see e.g. Walker v. Klise Mfg. Co.,* No. 3:18-CV-00477, 2020 WL 983087 (M.D. Tenn. Feb. 4, 2020), *report and recommendation adopted*, No. 3:18-CV-00477, 2020 WL 978682 (M.D. Tenn. Feb. 28, 2020). When service isn't proper, "the court must set aside an entry of default." *O.J. Distrib., Inc.*, 340 F.3d at 353 (citing *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987)). Here, the Court must first determine whether service of process was adequate before it proceeds to a review of the default judgment motion. The burden of proving service rests with Plaintiff. *See Boulger v. Woods*, 306 F. Supp. 3d 985, 993 (S.D. Ohio 2018), *aff'd,* 917 F.3d 471 (6th Cir. 2019) (citing *Sawyer v. Lexington–Fayette Urban County Gov't,* 18 F. App'x 285, 287 (6th Cir. 2001)).

Federal Rule of Civil Procedure 4(e) governs service on an individual within a judicial district in the United States. The provision provides that service may be accomplished by doing any of the following:

> (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or (2) doing any of the following: (A) delivering a copy of the summons and of the complaint to the individual personally; (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e). Here, Defendant was an individual living in the State of Tennessee at the time the instant case was filed; therefore, Plaintiff could effectively serve process pursuant to subsection (e).

Plaintiff undertook service of process pursuant to Federal Rule of Civil Procedure 4(e)(2). Under subsection (e), service may be completed by "delivering a copy of the summons and the complaint to the individual personally…." Fed. R. Civ. P. 4(e)(2)(A). Here, Plaintiff returned a proof of service form indicating that Defendant was personally served by Ashley Faulkenberry with the summons and complaint in this action at 2664 Copper Cove, Ooltewah, Tennessee on January 24, 2023. Accordingly, the Court concludes that service was proper which in turn grants the Court jurisdiction to address the issue of whether entry of a default judgment is appropriate.

### b. *Default Judgment pursuant to Rule 54(b) and Rule 55(b)*

Having found that the Court may exercise its jurisdiction over Defendant, it must next consider whether entry of default judgment is appropriate under Rule 55(b)(2), which empowers the Court to enter a default judgment. Fed. R. Civ. P. 55(b)(2). As an initial matter, the Court must consider whether the "action presents more than one claim for relief--whether as a claim, counterclaim, crossclaim, or third-party claim--or when multiple parties are involved. . . ." Fed. R. Civ. P. 54(b). If those circumstances are present, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." *Id*. Here, there is only one claim for relief against a sole Defendant. As such, this is an appropriate case for the immediate entry of default judgment so long as the requirements of Rule 55 are met.

Given that a clerk's default has been properly entered, Defendant has been properly served with process, and there is no reason that entry of default should be delayed, the Court will now move to consideration of the merits of Plaintiff's request for relief. In doing so, the Court first notes that once default has been entered, the factual allegations in the complaint are taken as true. *Bogard v. Nat'l Credit Consultants*, No. 1:12-CV-02509, 2013 WL 2209154, at *3 (N.D. Ohio May 20, 2013). For purposes of a default judgment, well-pleaded factual allegations will establish a defendant's liability. *Nat'l Satellite Sports, Inc. v. Mosley Entm't, Inc.*, No. 1:18-CV-1350, 2008 WL 5083149, at *1 (N.D. Ohio Nov. 25, 2008). The court may then hold a hearing, if necessary, to "(A) conduct an accounting; (B) determine the appropriate amount to be awarded in damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2). Additionally, if the party against whom default is sought has previously appeared before the court, that party "must be served with written notice of the application at least 7 days before the hearing." Fed. R. Civ. P. 55(b)(2).

Plaintiff seeks a default judgment by the Court under Rule 55(b)(2). The complaint sets forth a claim to recover the value of fraudulent TLA payments Defendant received pursuant to his employment contract with Plaintiff. As previously stated, Defendant's applications for TLA payments contained false information and were supported by fraudulent lease agreements, which resulted in Defendant receiving over $80,000.00 of TLA payments to which he was not entitled. Additionally, Plaintiff has demonstrated through its pleadings that Defendant is contractually obligated to reimburse Plaintiff for any TLA payments that were made to Defendant due to his false statements.[1] More specifically, Plaintiff has asserted claims against Defendant for fraud,

---

[1] Exhibits A-C to the Complaint contain Defendant's signed TLA applications in which Defendant agreed to reimburse Plaintiff "for any [TLA] payments made to [Defendant] as a result of any false statement willfully and knowingly made" in the application. [Doc. 1, Ex. A-C].

fraudulent omission, and contractual indemnity and advises the Court that it has incurred damages, fees, and expenses due to Defendant's conduct. When the Complaint was filed, Plaintiff requested a judgment against Defendant for all TLA payments he had received. While not crystal clear from Plaintiff's Complaint, after a hearing in this matter, the Court determined that TVA provided the TLA funds paid to Defendant, but apparently those funds were paid through Plaintiff as Defendant's employer. When TVA became aware of Defendant's fraud, TVA turned to Plaintiff for reimbursement of the TLA funds alleged to have been improperly paid. The Court further determined at the hearing that the claim made by TVA against Plaintiff over these payments has now been resolved, with Plaintiff paying to TVA a total sum of $59,000.00 in full satisfaction of TVA's claim. Defendant has made no repayment to Plaintiff or TVA of the TLA funds he received.

Given the above, the facts set forth in the complaint establish a claim for which Plaintiff is entitled to relief. Accordingly, the undersigned **RECOMMENDS** that Plaintiff's Motion for Default Judgment [Doc. 11] be **GRANTED**. With Defendant's liability to Plaintiff having been established, the Court will now turn to the issue of damages.

### III.   Damages

On May 30, 2023, the Court held a hearing by video to address Plaintiff's request for damages in this matter. Plaintiff and its counsel appeared, but Defendant failed to appear.[2] Plaintiff called Greg Howard, the company's Vice President for the Tennessee Region, to testify. Mr. Howard advised that Plaintiff is a technical staffing organization, and that TVA is one of the

---

[2] Although Defendant had waived a right to notice of the proceedings in this matter because he had failed to appear, the Clerk's Office mailed a copy of the Order setting the hearing to Defendant at the address where he had been personally served with process. Fed. R. Civ. P. 55(b)(2). In addition, upon inquiry from the Court, Plaintiff's counsel advised during the hearing that he had sent to Defendant a copy of all pleadings filed in this action. Other than the brief contact Plaintiff's process server had with Defendant when Defendant was personally served, Defendant has not made contact with Plaintiff or its counsel during the pendency of this matter.

company's clients. He further advised that Defendant was one of the employees hired by the company who was sent to work for TVA. According to Mr. Howard, Defendant was employed by Plaintiff from August 13, 2012 through February 7, 2016, during which time Defendant received TLA payments provided by TVA. Mr. Howard went on to explain the requirements that an employee assigned to TVA had to meet to be eligible for the TLA payments.

Mr. Howard testified that Defendant had signed written certifications on three different occasions in which he claimed he was eligible for TLA payments and provided documents in support of the certifications.[3] As a result of the submitted certifications, Defendant received TLA payments of just over $80,000.00 over the course of his employment with Plaintiff. While Defendant's employment with Plaintiff ended in 2016, it was not until April 8, 2022 that Plaintiff became aware of the fraud committed by Defendant in conjunction with obtaining TLA payments.[4] Mr. Howard explained that on that date, Plaintiff received an email from TVA employee Vanessa Thomason advising of an investigation TVA had conducted which had revealed Defendant's use of fraudulent information in his TLA certifications.[5] In support of her email communication, Ms. Thomason provided to Plaintiff a report from the Office of the Inspector General ("OIG") detailing the fraud committed by Defendant.[6]

---

[3] The certifications were entered into evidence at the hearing as Exhibits 3A, B and C.
[4] While Tennessee law provides for a six-year statute of limitations for actions arising from a contract, fraud can serve to toll that statute under the discovery rule. *See Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.,* 566 S.W.3d 671, 707-714 (Tenn. 2019). Given the fraud committed by Defendant in obtaining TLA payments, and the difficulty that Plaintiff would have had in discovering that fraud, Tennessee law provides Plaintiff with one year from the discovery of the fraud within which to file its lawsuit. As a result, Plaintiff's lawsuit was timely brought.
[5] The email was entered into evidence as Exhibit 1.
[6] This report was entered as Exhibit 2 in the hearing. The report entered into evidence contains redactions, but Mr. Howard testified that he had the unredacted version in front of him while testifying and it was Defendant who is identified in the unredacted version of the report as being the person who has fraudulently obtained TLA payments. That testimony is consistent with Ms. Thomason's email to Plaintiff entered into evidence as Exhibit 1.

The report from OIG stated that Defendant had not engaged in an arm's length transaction as to his purported permanent residence, had falsified lease documents, and had not incurred substantially all of the costs for the maintenance and upkeep of his claimed permanent residence. *See* Exhibit 2. More specifically, the report noted that Defendant's purported permanent residence, located in Texas, was originally owned by his mother-in-law, Lizzie Patterson.[7] At the time of Ms. Patterson's death, Defendant's wife and her two siblings each inherited a one-third interest in the residence via intestate succession. *Id.* The OIG investigation revealed that after Ms. Patterson died, it was Defendant's brother-in-law, Jerry Livingston, who moved into the residence rather than Defendant and his family. *Id.* In fact, Mr. Livingston continued to reside in the home at the time of the OIG investigation. *Id.* It appears that the mortgage for the residence remained in Ms. Patterson's name after she passed, and Defendant did make the payments on that mortgage while receiving TLA payments. *Id.* However, Mr. Livingston was simultaneously paying to Defendant between $900.00 and $1,000.00 per month. *Id.* While Defendant denied charging Mr. Livingston rent, Defendant received a total of $22,452.00 from Mr. Livingston during the period that he received TLA payments. *Id.* The OIG report further noted that Mr. Livingston had paid the monthly water bill and almost $5,000.00 more for a variety of other household maintenance expenses while Defendant was receiving TLA payments.

In speaking to numerous witnesses, the OIG was additionally able to determine that neither Defendant's wife nor any dependent of Defendant lived in the purported permanent residence, as would have been required for Defendant to be eligible for TLA payments. *Id.* While Defendant's wife traveled to Texas regularly to visit family and babysit her grandchildren, she was living with

---

[7] Defendant told the OIG investigator that Ms. Livingston had purchased this residence for him and his wife rather than herself but had done so in her name because Defendant's credit was not good. Defendant provided the OIG with no proof to support this contention.

Defendant in what was designated as his temporary residence. *Id.* Defendant claimed that his wife did reside in the residence at issue, but Mr. Livingston, who everyone agrees was living in the home during the relevant period, disputed that claim. *Id.* Even more importantly, the OIG report states that Defendant admitted to investigator's that the lease agreements submitted with his application for TLA payments were not "real" but were instead "manufactured for the purpose of showing [he] paid for a permanent residence." [Sealed Exhibit 2, p. 3].

Based upon the documents entered into evidence at the hearing in this cause and the testimony of Greg Howard, it is clear that Defendant committed fraud by providing false information on his certification forms submitted to obtain TLA payments and by providing a fraudulent lease. It is further evident that Defendant did not meet the qualifications required to obtain TLA payments. The question then becomes what damages should be awarded to Plaintiff due to Defendant's actions.

Mr. Howard testified that upon receipt of the information regarding Defendant's fraud from TVA, Plaintiff entered into a settlement with TVA regarding the payments Defendant fraudulently received. Upon inquiry from the Court at the conclusion of his testimony, Mr. Howard advised the Court that Plaintiff was able to settle the claim made by TVA for the sum of $59,000.00. There was no proof that Plaintiff had paid to Defendant any portion of the TLA payments he received while employed by Plaintiff but assigned to work for TVA. So, while Plaintiff originally requested judgment against Defendant for the full amount of the TLA payments he received, the Court has determined that Plaintiff should have a judgment against Defendant for only the amount of money the company is out-of-pocket to TVA due to Defendant's fraud.

In its Complaint, Plaintiff further requested that Defendant be required to pay its attorney fees and the costs associated with this cause. The Court determined that it was appropriate to allow

Plaintiff to present evidence post-hearing of the amount of the attorney fees incurred and the legal basis for its claim for reimbursement of attorney fees. Following the hearing, Plaintiff's counsel filed a notice advising the Court that after further investigation, Plaintiff concluded that it had no statutory or contractual basis for claiming an award of attorney fees and withdrew the request for those fees.[8] [Doc. 17]. Plaintiff did note that it was not withdrawing its requests for an award of costs, noting that Plaintiff would submit the required Bill of Costs following entry of the judgment in this action.

### IV. Conclusion

For reasons stated above, this Court **RECOMMENDS**[9] that Plaintiffs' Motion for Default Judgment be **GRANTED**. This Court **FURTHER RECOMMENDS** that Plaintiff be awarded damages against Defendant in the amount of $59,000.00. The Clerk's Office is instructed to mail a copy of this Report and Recommendation to Defendant at the address used by Plaintiff to serve him with process.

RESPECTFULLY SUBMITTED,

/s/Cynthia Richardson Wyrick
United States Magistrate Judge

---

[8] The Court sincerely appreciates counsel's diligence and candor regarding this issue, especially given that Defendant has failed to provide any defense in this action. The Court notes that it had independently reached the same conclusion as Plaintiff's counsel but Plaintiff's withdrawal of the request for attorney fees saved the Court the time which would have been required to analyze the issue in this Report and Recommendation.

[9] Objections to this Report and Recommendation must be filed within 14 days after service of this recommended disposition on the objecting party. 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Fed. R. Civ. P. 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).